UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

SHAWN GLOVER,

                      Petitioner,

       -vs-

VICTOR HERBERT,

                  Respondent.
_____

**DECISION AND ORDER**
No. 01-CV-6366

## I.      Introduction

Shawn Glover ("Glover" or "Petitioner"), acting *pro se*, filed his initial petition for habeas relief pursuant to 28 U.S.C. § 2254 on July 31, 2001, challenging his conviction in Monroe County Court on one count of second degree murder and four counts of first degree robbery based on his participation in the robbery of a drug house and the murder of one of its occupants in 1995. *See* Docket #1. On March 26, 2003, he sought to have his petition held in abeyance so that he could return to state court to exhaust certain claims. The Court (Payson, M.J.) denied his application without prejudice, stating that he could re-file and attempt to demonstrate that he was entitled to a stay under *Rhines v. Weber*, 544 U.S. 269 (2005). On November 1, 2004, through attorney Donald Thompson, Esq., Glover filed another motion for a stay. *See* Docket #29.  Respondent has opposed the stay request. *See* Docket #33.

## II.      Analysis of Petitioner's Second Motion for a Stay

Glover contends that if permitted to file an amended petition, he would allege that

> following his unlawful arrest, a statement (which was a direct and unattenuated product of such arrest) was improperly taken from him and that statement, together with physical evidence seized during the investigation (which the prosecutor claimed linked the petitioner to the commission of the crime, but in

fact, excludes petitioner as a perpetrator) formed the sole basis for petitioner's
present conviction.

Petitioner's Motion for a Stay at 3 (Docket #29). Glover goes on to state that he intends to have

DNA testing performed on a ski mask which was introduced into evidence at trial. *See id.* at 4.

Thus, it appears that Glover plans to assert two claims: (1) a Fourth Amendment claim and (2) a

claim of actual innocence based on newly discovered evidence.

The Supreme Court has held that, in keeping with the purposes of AEDPA's[1]

amendments to the habeas corpus statute, "stay and abeyance [of habeas petitions] should be

available only in limited circumstances." *Rhines v. Weber*, 544 U.S. at 277. Stays should be

granted only "if the petitioner had good cause for his failure to exhaust, his unexhausted claims

are potentially meritorious, and there is no indication that the petitioner engaged in intentionally

dilatory litigation tactics." *Id.* Neither the Supreme Court nor the Second Circuit has yet defined

the contours of "good cause" in the context of stay and abeyance, and district courts in this

Circuit have varied in their interpretations of the standard for "good cause." *Wallace v. Artus*,

No. 05 CIV. 0567 SHS/JCF, 2006 WL 738154, *4 (S.D.N.Y. Mar. 23, 2006) (citing *Fernandez

v. Artuz*, No. 00 Civ. 7601, 2006 WL 121943, at *5 (S.D.N.Y. Jan. 18, 2006) (collecting cases);

*Pace v. DiGuglielmo*, 544 U.S. 408, 125 S. Ct. 1807, 1813 (2005) (stating that "filing a

'protective' petition in federal court and asking the federal court to stay and abey the federal

habeas proceedings until state remedies are exhausted . . . [as a method of coping with]

reasonable confusion about whether a state filing would be timely will ordinarily constitute

'good cause' for him to file in federal court")).

---

[1] Antiterrorism and Effective Death Penalty Act, Pub. Law No. 104-132, 110 Stat. 1214.

The Court notes that Glover has not directly addressed the *Rhines* element of "good cause" in his motion for a stay, although he does contend that he has not engaged in any dilatory tactics. He states that the absence of scientific procedures to test the mask for DNA evidence at the time of his trial excuses his delay in filing this motion for a stay. *See* Petitioner's Motion for a Stay at 7 (Docket #29). However, the Court need not decide whether "good cause" exists for the failure to exhaust since the proposed claims are plainly without merit.

Turning first to the claim based on Glover's statement to the police, the Court notes that Glover is not arguing that the statement was involuntary or coerced in any way. Rather, the sole basis for the statement's exclusion, according to Glover, is that it is the direct result of an arrest which violated the Fourth Amendment and it is therefore the "fruit of the poisonous tree."  In *Stone v. Powell*, 428 U.S. 465 (1976), respondent argued that physical evidence used in his trial was the product of an illegal arrest. The Supreme Court held that federal courts could not, on a state prisoner's petition for a writ of habeas corpus, consider a claim that evidence obtained in violation of the Fourth Amendment should have been excluded at his trial, when the prisoner has had an opportunity for full and fair litigation of that claim in the state courts. 428 U.S. at 494; *accord Capellan v. Riley*, 975 F.2d 67, 70 (2d Cir. 1992); *Grey v. Hoke*, 933 F.2d 117, 121 (2d Cir. 1991).

Although *Stone* involved physical evidence seized in a search, the Supreme Court has since held that the *Stone* doctrine applies to a Fourth Amendment challenge to the introduction of a confession made after an allegedly unlawful arrest. *Cardwell v. Taylor*, 461 U.S. 571, 572-73 (1983) (reversing grant of habeas corpus where circuit court of appeals had found that there was an unattenuated causal link between the custodial statements made by respondent and

a violation of the Fourth Amendment). *Stone* clearly governs here and precludes habeas review because Glover's claim that his statement is inadmissible is based on an allegation that his arrest was violative of the Fourth Amendment. *Accord*, *e.g.*, *Dawson v. Donnelly*, 111 F. Supp.2d 239, 247 (W.D.N.Y. 2000) (same); *Gantt v. Artuz*, No. 97 Civ. 3032, 1999 WL 1206733, at *3 (S.D.N.Y. Dec. 16, 1999) (review of claim that arresting officers did not have probable cause to stop petitioner precluded by *Stone*); *Joyner v. Leonardo*, No. 99 Civ. 1275, 1999 WL 608774, at *3 (S.D.N.Y. Aug. 12, 1999) (no habeas review of search and seizure claim where probable cause to arrest was questioned); *Quinones v. Keane*, No. 97 Civ. 3173, 1998 WL 851583, at *4 (S.D.N.Y. Dec. 7, 1998) (no review permitted of search and seizure issues); *Walker v. Walker*, 259 F. Supp.2d 221, 223-24 (E.D.N.Y. 2003) (claim that weapon seized by police and out-of-court identification made by victim should be suppressed because arresting officers did not have a reasonable suspicion to justify their initial pursuit not cognizable under *Stone*).

*Stone* requires only that "the state have provided the *opportunity* to the state prisoner for full and fair litigation of the Fourth Amendment claim." *Gates v. Henderson*, 568 F.2d 830, 839 (2d Cir. 1977) (emphasis added). Under this standard, there are only two instances in which a Fourth Amendment claim will be reviewed by a federal habeas court: (1) where the state has provided no corrective procedures at all to redress the alleged Fourth Amendment violations; or (2) where the state has provided a corrective mechanism, but the defendant was unable to use it because of an "unconscionable breakdown in the underlying process." *Capellan*, 975 F.2d at 70 (citing *Gates*, 568 F.2d at 840).

Clearly, New York has provided the requisite corrective procedures to address Glover's Fourth Amendment claim. *See* N.Y. Crim. Proc. Law § 710.10; *Capellan*, 975 F.2d at 70 n. 1

(noting that "federal courts have approved New York's procedure for litigating Fourth Amendment claims, embodied in . . . [N.Y. Crim. Proc. Law § 710.10], as being facially adequate") (quotations and citations omitted). Although the Second Circuit has not defined precisely what constitutes an "unconscionable breakdown," it has observed that some type of "disruption or obstruction of a state proceeding" is required. *Capellan*, 975 F.2d at 70; *see also Joyner*, 1999 WL 608774, at *4 ("[A]n "unconscionable breakdown" in the underlying process arises only when "there has been no meaningful inquiry by the state courts into the petitioner's Fourth Amendment claim or when a 'procedural catch-22' prevents the merits of petitioner's claim from ever being heard by any state court.") (quoting *Burton v. Senkowski*, No. 94 Civ. 3836, 1995 WL 669908, at *4 (E.D.N.Y. Nov. 5, 1995) (citing *Cruz v. Alexander*, 477 F. Supp. 516, 523 (S.D.N.Y. 1979), *appeal dismissed*, 622 F.2d 573 (2d Cir. 1980)).[1]

Here, Glover availed himself of New York's corrective procedures: a suppression hearing was held in Monroe County Court after which the judge made extensive findings of fact and concluded as a matter of law not only that the prosecution presented sufficient evidence of probable cause to arrest Petitioner but also that his statement to police was voluntary beyond a reasonable doubt. *See* April 29, 1996 County Court Order (Docket #33-2). Glover has not alleged that there was any breakdown in the process afforded to him. Thus, his Fourth Amendment claim is not reviewable by a federal habeas court, and no purpose would be served by granting a stay to permit him to exhaust it state court.

---

[1] The "procedural 'catch-22'" in *Cruz* that prevented the merits of the petitioner's illegal wiretapping claim from ever being addressed by any state court arose out of the confusion generated by the case's extensive procedural history. 477 F. Supp. at 522-23. Neither the state trial court nor the state appellate courts reviewed the merits of this claim because "each believed that the other had done or would do so" *Id.* at 523. Such was not the case here.

I turn next to Glover's "actual innocence" claim. In *Herrera v. Collins*, 506 U.S. 390, 404-05, 417 (1993), the Supreme Court rejected a habeas petitioner's claim of actual innocence based on several affidavits exculpating him as a perpetrator. Petitioner Herrera argued that he was entitled to habeas relief because newly discovered evidence showed that his conviction was factually incorrect.  The Supreme Court began by reviewing its jurisprudence regarding the "fundamental miscarriage of justice" exception which allows a petitioner, otherwise subject to defenses of abusive or successive use of the writ, to have his federal constitutional claim considered on the merits if he makes a proper showing of actual innocence. *Id.* (citing *Sawyer v. Whitley*, 505 U.S. 333 (1992)). This rule, the Supreme Court observed, "is grounded in the 'equitable discretion' of habeas courts to see that federal constitutional errors do not result in the incarceration of innocent persons." *Id.* (citing *McCleskey v. Zant*, 499 U.S. 467, 502 (1991)). However, that body of habeas jurisprudence "makes clear that a claim of 'actual innocence' is not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits." *Id.* According to the Supreme Court, "[h]istory shows that the traditional remedy for claims of innocence based on new evidence, discovered too late in the day to file a new trial motion, has been executive clemency." *Id.*[2]

Thus, the Supreme Court held, petitioner Herrera was not entitled to habeas relief based on the reasoning of that line of cases because he was not seeking exemption of a procedural error so that he could bring an independent constitutional claim challenging his conviction or sentence.

---

[2]  The Court observes that it is not "too late in the day" for Glover to file a motion to vacate the judgment against him. He can, and apparently is planning to, raise his claim of newly discovered evidence in state court via a motion to vacate the judgment pursuant to New York Criminal Procedure Law § 440.10(1)(g).

A petitioner may avail himself of the fundamental miscarriage of justice "only where [he] *supplements* his constitutional claim with a colorable showing of factual innocence." *Id.* (citing *Kuhlmann v. Wilson,* 477 U.S. 436, 454 (1986) (emphasis in original)). As the Supreme Court had "never held that [the fundamental miscarriage of justice exception] extends to freestanding claims of actual innocence," the exception was inapplicable to Herrera's claim. *Id.*

The Supreme Court explained that assuming *arguendo* that a "freestanding" claim of actual innocence based on newly discovered evidence–such as DNA testing–could serve as a ground for habeas relief, at a minimum, "the threshold showing for such an assumed right would necessarily be extraordinarily high." *Id.* at 417. The Supreme Court stated,

> We may assume, for the sake of argument in deciding this case, that in a capital case a truly persuasive demonstration of "actual innocence" made after trial would render the execution of a defendant unconstitutional, and warrant federal habeas relief if there were no state avenue open to process such a claim. But because of the very disruptive effect that entertaining claims of actual innocence would have on the need for finality in capital cases, and the enormous burden that having to retry cases based on often stale evidence would place on the States, the threshold showing for such an assumed right would necessarily be extraordinarily high. The showing made by petitioner in this case falls far short of any such threshold.

*Id.* Thus, even assuming that a claim of actual innocence is even available in a non-capital habeas case, Glover would have to meet an extraordinarily high threshold. On the facts presented here, he is unable to do so.

Glover contends that "a mask seized during the investigation (which the prosecutor argued at trial the murderer wore) will, once subjected to DNA testing, exclude him as the perpetrator of the offense[.]" Petitioner's Motion for a Stay at 4 (Docket #29). Some background regarding the underlying incident is necessary in order to analyze this claim. On November 28, 1995, Freddie Glover (Petitioner's brother), along with Eli Lewis ("Lewis") and Glover,

allegedly staged a home-invasion robbery at a drug house at 1009 Joseph Avenue. During the incident, one of the victims was able to place a 911 call, and the police responded to the scene. There they found a white male identified as Shawn Hart ("Hart") lying on the kitchen floor with a fatal gunshot wound to the head.  The police placed Jennifer Sarquist ("Sarquist"), Hart's girlfriend; a Hispanic male, who was visiting Hart at the time; and Freddie Glover into patrol cars. According to Officer James Burke ("Burke"), Sarquist stated that Freddie Glover had shot her husband. Burke related that Sarquist "'pointed to the police car directly in front of us, the one I had just gotten out of with Freddie Glover. She said, that's the man who shot my husband. I said, how do you know that's the man that shot your husband? She said, well, he was wearing a mask . . . he took his mask off, and he is the man who shot my husband.'" Petitioner's Motion for a Stay at 4 (Docket #29). The other two perpetrators (Glover and Lewis) had jumped out a window as the police were arriving but were soon apprehended after a foot chase. Glover, after knowingly waiving his rights, gave a statement to the police describing his participation in the home invasion but stating that he did not see Hart get shot.

Glover contends that a ski mask retrieved from a garbage bin in "petitioner's alleged path of flight" from the crime scene "figured prominently" at Glover's trial. Petitioner's Motion for a Stay at 4 (Docket #29). As an initial matter, the Court disagrees with Glover's assessment of the importance of the mask. Of significance is Glover's statement to the police in which he wrote that all three of the perpetrators were wearing ski masks. *See* Petitioner's Statement, attached to Respondent's Appendix (Docket #33-2) ("My brother gave me a ski mask to wear and Eli [Lewis] had one in his pocket. My brother had one too."). However, even without the mask, the evidence against Glover was overwhelming, as discussed below.

Glover contends that despite Sarquist's initial identification of Freddie Glover as the man who shot Hart, the prosecutor contended at trial that Glover "was the man wearing the mask who [*sic*] Ms. Sarquist described as the killer, that the mask recovered was worn by the petitioner**,** and that his wearing of that mask confirmed his identity as the person who shot the victim." *Id.* at 5. Glover further argues that the evidence establishing his identity as a perpetrator was "wholly circumstantial" and that the only physical evidence linking him to the crime was the mask he supposedly work during the home invasion. *Id.* The Court disagrees with both of these positions.

First, contrary to Glover's contention, the prosecutor did not argue that Glover was the man wearing the mask whom Sarquist identified as the killer. Rather, the prosecutor contended that Glover was the masked individual who robbed Sarquist at gunpoint after Hart was shot. According to Sarquist's testimony, a man wearing a full black ski mask ordered her to go through the dead victim's pockets and remove any money from them. The prosecutor argued that this person was Glover, which was corroborated by Glover's statement to the police in which he stated that he made the female victim take money out of the dead victim's pockets. The prosecutor suggested that the mask described by Sarquist was one of the three identical ski masks[3] retrieved by the police or turned over by Sarquist. In fact, the prosecutor conceded that defense counsel was correct that Freddie Glover was the person who murdered Hart. Thus, Sarquist's identification of Freddie Glover (who also was wearing a mask) as the actual murderer does not exculpate Glover since the court charged accomplice liability under New York Penal

---

[3] Based on the fact that there was more than one mask, Glover would have to have DNA testing performed on all of the masks introduced into evidence at trial.

Law § 20.00.

Second, the evidence against Glover was not "wholly circumstantial." Officer David Galli ("Galli") testified that he arrived at 1009 Joseph Avenue about one minute after he received the dispatch about the shooting. He observed two black males dressed in black on a lighted, enclosed porch area; when they saw him, they started retreating. Galli immediately radioed a dispatch that two black males dressed all in black were "bailing out." He then saw the dead victim, and radioed that there was a "man down." Officer Ignacio Torres ("Torres"), who responded to the scene less than a minute after the dispatch, was watching the back of the building when he heard Galli call out that two black males were running toward the rear of the building. From his vantage point, Torres saw two black males jumping out of a window and trying to take their clothes off in the backyard. Torres waited by the cut-through at Weaver Street and observed Glover. Torres told Glover to show his hands and stay where he was; Glover stated that he did not have a gun. As Torres walked over, Glover jumped over a chainlink fence and a chase ensued. Eventually, Torres found Glover hiding in a doorjamb of a building. As Torres approached, Glover jumped up and fled again. Torres ultimately caught up with Glover and, with another officer's help, took Glover into custody. Once at the police station, Glover gave a voluntary written and signed statement inculpating himself in the home invasion. He stated that the robbery was his brother's idea to get money to pay off a debt. Glover admitted that he had a gun and was wearing a ski mask during the incident. Glover stated that after Hart was shot, "a lady [Sarquist] came out of the bathroom" and said "don't shoot." Glover told her "to go through the guy's [Hart's] pockets and give [him] his money." Sarquist took "thirty dollars out of his back pocket and threw it on the floor" and Glover picked it up. Glover related that he jumped out

a window when he realized that the police had arrived and that he dropped his gun while trying to escape. *See* Respondent's Appendix (Docket #33-2); Respondent's Answer (Docket #6).

Thus, the evidence against Glover was not just circumstantial; there also was compelling direct evidence of Glover's guilt–namely, his voluntary and knowing statement to the police. Although he does not state it directly, Glover's argument implies that there was actually a fourth perpetrator who was never apprehended by the police. Defense counsel made this argument at trial, and the jury rejected it; notably, there was no testimony by any of the surviving victims that there were four robbers. And, even if there was a fourth person, that would not relieve Glover of guilt as long as the jury found that he was a knowing participant in the home invasion and shooting. Based on the proof adduced at trial, even if Glover could prove that his DNA was not on any of the ski masks, the evidence that he knowingly participated in the crime was still overwhelming. Stated another way, the absence of Glover's DNA on the ski masks does not in any way establish that he is actually innocent of the crimes with which he was charged. Accordingly, because Glover's claim of actual innocence is plainly without merit, and potentially not cognizable on habeas review, *see Herrera*, *supra*, the Court denies with prejudice Glover's request for a stay.

## III.    Analysis of Claim Presented in Original Petition

The Court now may proceed to dispose of the one claim presented in Glover's original petition–appellate counsel was ineffective in failing to assert on direct appeal that Glover's arrest was without probable cause. On direct appeal, appellate counsel raised two claims: (1) the trial court erred in failing to hold a hearing regarding Officer Torres's pre-trial viewing of a series of photographs that included a photograph of Petitioner; (2) Petitioner's sentence was harsh and

-11-

excessive. The Appellate Division, Fourth Department, of New York State Supreme Court held

that the trial court properly denied Glover's request for a hearing since the police officer's

viewing of photographs constituted trial preparation, not an identification procedure. The court

also held that the sentence was neither unduly harsh nor severe.

The two-pronged standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984),

applies equally to claims of ineffective assistance of appellate counsel. *E.g.*, *Claudio v. Scully*,

982 F.2d 798, 803 (2d Cir. 1992) (holding that in order to prevail on an ineffective assistance of

appellate counsel claim, appellant must show first that his counsel's performance was deficient

and second that the deficiency caused actual prejudice to his defense), *cert. denied*, 508 U.S. 912

(1993). In attempting to establish that appellate counsel's failure to raise a claim on appeal

constitutes deficient performance, it is insufficient for the petitioner to show "merely that

counsel omitted a nonfrivolous argument, for counsel does not have a duty to advance every

nonfrivolous argument that could be made." *Id.* (citing *Jones v. Barnes*, 463 U.S. 745, 754

(1983)). Whether the neglected appellate issue is based on federal or state law, the burden rests

on petitioner to show "that counsel omitted significant and obvious issues while pursuing issues

that were clearly and significantly weaker." *Id.*  In assessing appellate counsel's performance,

the Court must judge the conduct at issue on the basis of the facts of the particular case, viewed

as of the time that counsel was preparing the appeal. *Strickland*, 466 U.S. at 690.

Glover's probable cause argument was not likely to succeed on appeal, and indeed, in all

probability, would have been summarily rejected. As discussed above in this opinion, the

suppression court made detailed findings of fact on this issue and determined that there was

ample probable cause to arrest Glover. The state appellate court, which must give deference to

the suppression court's factual findings, had no basis to overturn its conclusions, which were well supported by the record. Since the omitted argument is without merit, Glover is unable to prove prejudice since omission of insignificant claims that will likely be unsuccessful does not prejudice a defendant. *See Mayo v. Henderson*, 13 F.3d 528, 534 (2d Cir. 1994) ("To establish prejudice in the appellate context, a petitioner must demonstrate that 'there was a "reasonable probability" that [his] claim would have been successful . . . .'") (alteration in original) (quoting *Claudio v. Scully*, 982 F.2d at 803); *see also Bolender v. Singletary*, 16 F.3d 1547, 1573 (11th Cir. 1994) ("[T]he failure to raise nonmeritorious issues does not constitute ineffective assistance."). Because Glover cannot prove prejudice, it is unnecessary to address whether counsel's performance was deficient. *Strickland*, 466 U.S. at 697 ("[T]here is no reason for a court deciding an ineffective assistance claim to . . . address both components of the inquiry if the defendant makes an insufficient showing on one."). Accordingly, this claim does not warrant federal habeas relief.

## IV.    Conclusion

For the reasons stated above, petitioner Shawn Glover's application for a stay is rejected and his petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 is dismissed. Because petitioner has failed to make a substantial showing of a denial of a constitutional right, I decline to issue a certificate of appealability. *See* 28 U.S.C. § 2253.

**IT IS SO ORDERED**

/s/ *Victor E. Bianchini*

_____
VICTOR E. BIANCHINI
United States Magistrate Judge

DATED:      May 23, 2006
            Rochester, New York.

-13-